**Monroe HANISH**

v.

**WESTINGHOUSE BROADCASTING COMPANY.**

Civ. A. No. 77–3171.

United States District Court,
E. D. Pennsylvania.

March 17, 1980.

**398**

Joseph D. Shein, Shein & Brookman, P. A., Philadelphia, Pa., for plaintiff.

Arthur E. Newbold, IV, Steven B. Feirson, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

I.

This is an action for defamation brought before this Court on the basis of diversity jurisdiction. On December 30, 1977 defendant moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the ground that defendant was privileged to make the alleged defamatory publication. This Court denied defendant's motion, it appearing to this Court at that time that there existed a genuine issue of material fact. Thereafter, both parties undertook discovery and, on May 23, 1979, defendant filed this second motion for summary judgment. For reasons set forth herein, defendant's motion is denied.

II. UNDISPUTED FACTS

By letter dated February 10, 1976, plaintiff, representing himself as a member of the Board of Directors of the Muscular Dystrophy Association (M.D.A.), wrote to the Whitechapel Bell Foundry (Whitechapel) of London, England which had recently cast the "Bicentennial Bell". In this letter plaintiff proposed to Whitechapel that it sell to him the metal shavings or chips derived from the process of tuning the bell in order that he might package and sell individual pieces of the bell to the public as momentos of America's Bicentennial celebration. Plaintiff stated in the letter to Whitechapel that all profits from the sale of the shavings would go to M.D.A., but that since M.D.A.'s charter precluded expenditures of its capital for purposes which could be classified as "risk", his proposal would have to be carried out with private funds with the profits donated to M.D.A. On or about May 16, 1976, Whitechapel shipped 403 pounds of the metal shavings to plaintiff. Plaintiff took possession of the shavings and remitted the agreed price to Whitechapel.

As stated in his deposition, plaintiff subsequently contacted numerous individuals in an attempt to get his marketing scheme off

the ground. Plaintiff ultimately entered into a partnership with two individuals, Feldman and Weidman. However, Whitechapel, believing that plaintiff was intending to sell the shavings for his own profit, brought an action on September 27, 1976 against plaintiff, Feldman, and Weidman in the United States District Court for the District of Massachusetts seeking to rescind the contract and to enjoin plaintiff from proceeding with the marketing of the shavings. The complaint in that action alleged, inter alia, that plaintiff herein had represented himself to Whitechapel as a Director of M.D.A.; that plaintiff herein was not then, and never has been, a director of M.D.A.; that plaintiff herein had proposed to Whitechapel that the profits from the sale of the shavings would go to M.D.A.; and that Whitechapel had only sold the shavings to plaintiff on the understanding that the profits would go to M.D.A. The Whitechapel complaint also alleged that plaintiff had obtained the shavings from it fraudulently, and that plaintiff, Feldman, and Weidman were engaged in a further fraudulent scheme to sell the shavings for their own profit.

On October 8, 1976, United Press International (U.P.I.) disseminated a news report concerning the complaint filed by Whitechapel. This report provided in pertinent part:

A London foundry which cast America's original Liberty Bell is suing to block a Bucks County firm from selling 403 pounds of chips carved off the Bicentennial Bell, England's birthday gift to the United States.

\*   \*   \*   \*   \*   \*

In a suit filed Thursday in U. S. District Court, the London firm Whitechapel Bell Foundry Ltd. accused Manufacturer's Marketing Co. of Feasterville, Pa. of being involved in a "fraudulent scheme".

\*   \*   \*   \*   \*   \*

Last February, the suit said, Monroe Hanish of New Jersey, representing himself as a director of The Muscular Dystrophy Association proposed to Whitechapel the purchasing of the chips or shavings

derived from the tuning of the Bicentennial Bell.

Hanish was quoted as saying that all the profits of the sale of the chips would go to the Dystrophy Association.

Whitechapel said it agreed to sell 403 pounds of chips on the basis that profits would go to the Association   .   .   ..

Whitechapel said it requested, but did not receive, a confirmation from Hanish that all the profits had gone to the fight against muscular dystrophy.

\*   \*   \*   \*   \*   \*

Named as defendants with Hanish were Frederick M. Feldman and Harold R. Weidman, trading as Manufacturer's Marketing.

\*   \*   \*   \*   \*   \*

On the same day, KYW television station in Philadelphia, which at all relevant times was owned, managed, operated and controlled by defendant Westinghouse Broadcasting Company, broadcast two news stories (one on its 5:30 p. m. news program, the other on its 11:00 p. m. news program) based on the above quoted report from U.P.I. The first of these broadcasts stated:

Money is the reason three Delaware County men are in hot water tonight.

The Whitechapel Bell Foundry of London   .   .   . the firm that cast the latest Liberty Bell   .   .   . has filed suit against the three   .   .   . claiming they sold shavings of the bell for their own profit   .   .   . rather than charity   .   .   . as they promised the foundry they would.

The suit was filed against Monroe Hanish of New Jersey   .   .   . and Frederick Feldman and Harold Weidman   .   . both of Pennsylvania.

The second broadcast, similar but not identical, stated:

The Whitechapel Bell Foundry of London has filed a Federal Court Suit against three Delaware Valley men.

Whitechapel, which cast the Bicentennial Liberty Bell, claims the three men sold shavings from the Bell for their own

profit, rather than for charity, as they had told the foundry they would do.

These men are identified as Monroe Hanish of New Jersey, and Frederick Feldman, and Harold Weidman, both of Pennsylvania.

It is not disputed that plaintiff at no time sold the shavings for his own profit.

## III. APPLICABLE LAW

Plaintiff complains in the instant action that the Whitechapel complaint did not allege that plaintiff *had sold* the shavings for profit rather than charity, and that defendant's broadcast had defamed him by stating that Whitechapel did so claim.

Defendant presents four grounds in support of its motion for summary judgment: first, that the broadcasts complained of were not defamatory; second, that even if defamatory, the broadcasts are privileged under the common law of Pennsylvania as having been made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause; third, that the broadcasts are privileged under the common law of Pennsylvania as a fair and accurate report of a judicial pleading; and, fourth, that the plaintiff is a public figure and that he cannot make the showing of actual malice required of public figures by the First Amendment to the Constitution of the United States to recover damages for defamatory falsehoods.

Jurisdiction being based on diversity of citizenship, this Court shall look to the law of the Commonwealth of Pennsylvania and insofar as applicable, to the First Amendment to the Constitution of the United States in disposing of this summary judgment motion.

A. *The Defamatory Character of the Broadcasts*

■ In an action for defamation in Pennsylvania, the plaintiff has the burden of proving both the defamatory character of the communication and the understanding by the recipient of it as intended to be applied to the plaintiff. Pa.Cons.Stat.Ann. tit. 42, § 8343 (1979). Procedurally, it is the function of the court to determine, in the first instance, whether the communication complained of is capable of a defamatory meaning. *Franklin Music Co. v. American Broadcasting Co. et al*, 616 F.2d 528 at 540 (3d Cir., 1979); *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971); Restatement (Second) of Torts § 614. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from dealing with him." *Franklin Music, supra; Corabi, supra* at 442, 273 A.2d at 904; *Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962); Restatement (Second) of Torts § 559 (1977).

■ In the instant case, there is no question as to the content of the alleged defamatory broadcast and it clearly appears that the communication is capable of a defamatory meaning in that it does state that plaintiff was accused by Whitechapel of having sold the shavings for his own profit, rather than charity as promised. "The test is . . . the impression [the publication] would naturally engender, in the minds of the average person among whom it is intended to circulate." *Boyer v. Pitt Publishing Co.*, 324 Pa. 154, 157, 188 A. 203, 204 (1936). Looking at the broadcast in this manner, it can fairly be taken to mean that plaintiff had breached his promise to Whitechapel, and that he had appropriated to his own use, money that was intended to go to charity. Such an accusation is capable of tending to so harm the reputation of plaintiff as to lower him in the estimation of the community or to deter third persons from associating with him. Although it is the function of the court under Pennsylvania law to determine whether the communication complained of is capable of a defamatory meaning, it is the function of the jury to determine whether a communication, capable of a defamatory meaning, was so understood. *Corabi, supra* at 442, 272 A.2d at 904.

B. *Defendant's Claim of Common Law Privilege*

■ Defendant claims that the KYW broadcasts were privileged under the common law of Pennsylvania as a "substantially fair and accurate" report of a judicial proceeding. *See Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53 (1971) (qualified privilege to make fair and accurate report of judicial proceedings); Restatement (Second) of Torts § 611 (1977); Prosser, Handbook of the Law of Torts § 118 at 830–31 (4th ed., 1971). Initially, there is a question whether this privilege is even applicable to the facts of this case. Plaintiff cites Prosser's Handbook of the Law of Torts (4th ed., 1971), which states in § 118 at 831, "[t]hus it is the prevailing view, with some few courts to the contrary, that a pleading or deposition filed in a case but not yet acted upon may not be reported under the claim of privilege." Similarly, The Restatement of Torts provides in comment e to § 611,

> *Necessity of official action in judicial proceedings.* A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition before any judicial action has been taken is not within the rule stated in this Section.

However, Professor Eldredge, an adviser to the Restatement (Second) of Torts, has written in his recent book:

> Whether the privilege to report a "judicial proceeding" extends to reporting defamatory statements contained in pleadings or other papers filed in court, which have not yet come before a judicial officer and upon which no judicial action has been taken, is a question upon which the cases are in sharp conflict.

> \* \* \* \* \* \*

It is perfectly clear, with respect to cases decided since 1972, that the heavy weight of authority is contrary to the earlier rule, and is that the report of pleadings filed in court which have not yet come before a judicial officer and upon which no judicial action has been taken comes within the privilege to report "judicial proceedings". The trend is strongly in this direction.

Eldredge, The Law of Defamation, § 79(b)(1) at 427, 430 (1978). Neither counsel has directed this Court to any Pennsylvania cases deciding this issue, nor has independent research by this Court revealed any such cases. This Court has considerable difficulty with the reasoning underlying this rule. Mr. Justice Holmes has stated, "[i]f pleadings and other documents can be published to the world by any one who gets access to them, no more effectual way of doing malicious mischief with impunity could be devised than filing papers containing false and scurrilous charges, and getting those printed as news." *Cowley v. Pulsifer*, 137 Mass. 392 (1884). However, it appears that the scope of the rule is rather narrow. In order for the privilege to attach, "it is enough that *some* judicial action has been taken. . . ." Restatement (Second) of Torts § 611, comment e (1977) (emphasis added). Thus, it has been held that "[t]he privilege existed with respect to a bill in equity presented to a judge in chambers who ordered an *ex parte* preliminary injunction until a hearing; or a bill presented to the court on which a show cause order has been made." Eldredge, *supra* at 431 citing *Metcalf v. Times Publishing Co.*, 20 R.I. 674, 40 A. 864 (1898); *American Pub. Co. v. Gamble*, 115 Tenn. 663, 90 S.W. 1005 (1906); *Kimball v. Post Pub. Co.*, 199 Mass. 248, 85 N.E. 103 (1908). As Judge Pound noted in *Campbell v. New York Evening Post*,

> [t]he incongruous result follows that a newspaper may freely . . . publish the contents of a complaint, if it has been read and filed on an *ex parte* application for an injunction, an order of arrest, an attachment, or an order of publication, yet, if the complaint has merely been filed as a public document in a public office, the newspaper which publishes its contents runs the risk of repeating a libel.

> \* \* \* \* \* \*

To say that the newspapers may freely publish the entire proceedings in a case from an ex parte application for an order of arrest or other remedial process under the protection of privilege, but may speak only at their own risk before the case actually comes before a court or judge in some form, is to make a distinction to which publishers give little heed.

245 N.Y. 320, 157 N.E. 153, 155 (1927). This court is not impressed by the so-called majority rule stated in Prosser, *supra* and the Restatement, *supra*. Nevertheless, it need not predict which way the Pennsylvania Supreme Court would decide this issue because the record shows that the complaint filed by Whitechapel had been acted upon by a judge before the time of the KYW broadcast. Specifically, a temporary restraining order was entered on September 29, 1976, and continued on October 5 to October 15, 1976 by the United States District Court for the District of Massachusetts. Thus, the record in this case is such that whether this Court predicts that Pennsylvania will follow the so-called majority rule or whether it will embrace the more enlightened reasoning of Judge Pound in *Campbell*, the result is the same—the broadcast was privileged provided it was a "substantially fair and accurate" report of the complaint filed in the United States District Court. Such a privilege is conditional rather than absolute and "is forfeited if the publisher steps out of the scope of the privilege or abuses the occasion." *Sciandra v. Lynett*, 409 Pa. 595, 600, 187 A.2d 586, 589 (1963). Whether defendant has stepped out of the scope of the privilege or abused the occasion is, in this instance, a question whether defendant's broadcast was a "substantially fair and accurate" summary of the complaint filed by Whitechapel. However, this is a question of fact, which in this case presents a genuine issue of material fact. Such an issue of fact is one to be decided at trial by the fact finder—in this case, the jury. It appears that defendant contends that this is an issue which the court should determine in this summary judgment proceeding. Although the undisputed facts in this case have enabled the court to determine as a matter of law that defendant is entitled to a claim of privilege, whether the broadcast was a "substantially fair and accurate" report is, however, an issue of fact, and as pointed out above, a genuine issue of material fact. Defendant appears to rely upon *Sciandra, supra*, in support of his contention that the court should determine on the basis of the record before it, whether the broadcast was "substantially fair and accurate." The Supreme Court of Pennsylvania stated in *Sciandra*, in holding that the evidence adduced at trial led only to the conclusion that there was no abuse of the privilege, that, "it is the duty of the court to declare as a matter of law that no abuse of the "occasion of privilege" exists *where the evidence adduced leads to but one conclusion*." *Sciandra, supra* at 606, 187 A.2d at 592 (emphasis added). This rule is apparently well established in Pennsylvania. *See e. g. Biggans v. Foglietta*, 403 Pa. 510, 513, 170 A.2d 345, 346 (1961) (whether a privileged occasion was abused is for the determination of the jury unless the facts are such that but one conclusion can be drawn); *Montgomery v. City of Philadelphia*, 392 Pa. 178, 182 n. 4, 140 A.2d 100, 102 n. 4 (1958) (same). *See also* Restatement (Second) of Torts § 619, comment b (1977) (same). Although the content of the broadcast and the content of the complaint are undisputed, the issue as to whether the broadcast is "substantially fair and accurate" is disputed and the record is such that it does not "lead to but one conclusion." The issue presented is such that reasonable minds may certainly differ as to whether there has been an abuse of the privilege in this case, but in any event this factual issue is not one to be determined by summary judgment.

Defendant also urges that it is entitled to summary judgment under a more general common law privilege than that discussed above. Defendant asserts that the broadcasts were privileged as having been made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable or proper cause. This general common law privilege, as the special common law

privilege discussed above, is a conditional or qualified privilege. *See MacRae v. Afro-American Co.*, 172 F.Supp. 184 (E.D.Pa. 1959).

The status of this general common law privilege is uncertain after *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406, 418–19 (D.C.Pa.1978). *Gertz* held that a plaintiff in a defamation action may not recover absent a showing of fault, amounting at least to negligence, on the part of the defendant. 418 U.S. at 347, 94 S.Ct. at 3010. As Justice Roberts, in a concurring opinion, noted,

> [Gertz] drastically shifts the burden of proof in defamation actions and thereby reduces the unusually heavy burden heretofore placed on defendants in such actions. In proving the necessary element of fault to make out his cause of action, the plaintiff will necessarily have to prove facts that would ordinarily negate the existence of a conditional privilege.

*Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441, 446–47 (1975). In other words, whereas the defendant formerly had the burden to prove that he acted reasonably as a defense to an action for defamation, *Gertz* may require the plaintiff to prove, as an element of his case in chief, that the defendant failed to act reasonably. At any rate, plaintiff clearly contends that defendant was negligent in the preparation of its broadcast; this is a question of material fact which must be decided by the trier of fact. Accordingly, this Court is unable to grant defendant's motion for summary judgment on the basis of either the special or general common law privilege asserted by defendant because there are two issues of material fact which must await decision by the trier of fact—in this case, the jury: whether the broadcasts in question were substantially fair and accurate reports of the Whitechapel complaint, and, if they were not substantially fair and accurate reports, whether defendant was negligent in the preparation of the broadcasts.

### C. *The New York Times v. Sullivan*

Defendant's final ground in support of its motion for summary judgment is that plaintiff is a public figure for the limited purposes of this action, and that he cannot demonstrate actual malice on the part of KYW as required of public figures in defamation actions by *The New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Gertz v. Robert Welch, Inc., supra.* This Court agrees with plaintiff that, on the basis of this record, he should not be deemed a public figure. Defendant argues that plaintiff, in connection with his charitable fund raising activities, naturally became the subject of press attention. This Court must reject this contention. As stated by the Supreme Court in *Time, Inc. v. Firestone*:

> [I]n so doing [defendant] seeks to equate public controversy with all controversies of interest to the public. Were we to accept this reasoning, we would reinstate the doctrine advanced in the plurality opinion in *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 . . . (1971), which concluded that the *New York Times* privilege should be extended to defamatory falsehoods whenever the statements concern matters of general or public interest. In *Gertz*, however, the Court repudiated this position
>
> . . . . .

424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). *New York Times v. Sullivan* is not applicable.

An appropriate Order will be entered in accordance with this Memorandum.