**FIRST LEHIGH BANK, First Lehigh Corporation, James L. Leuthe and Larry Ziegenfuss, Appellants,**

v.

**Richard COWEN and the Morning Call, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued June 10, 1997.

Filed Sept. 4, 1997.

William A. Ehrlich, Allentown, for appellants.

Malcolm J. Gross, Allentown, for appellees.

Before BECK, KELLY and SCHILLER, JJ.

KELLY, Judge:

In this appeal we are asked to determine whether the fair report privilege applies to a media account of an initial pleading in the absence of judicial action upon the pleading. Specifically, we must decide whether the appellee newspaper possessed a qualified privilege to report information contained in a

---

private civil complaint against appellants in federal court but upon which no judicial action had been taken. We hold that the fair report privilege applied and that the newspaper fairly and accurately reported the information contained in the complaint. Accordingly, we affirm the trial court's order granting summary judgment in favor of the appellees, Richard Cowen and The Morning Call, Inc.

The salient facts and procedural history of this appeal have been aptly set forth in the trial court opinion as follows:

On May 17, 1995, Kenneth M. Kucharz and Katie Company, II ("Kucharz") filed a complaint against First Lehigh Bank, First Lehigh Corporation and Larry R. Ziegenfuss in the United State District Court, Eastern District of Pennsylvania. On May 23, 1995, Kucharz's attorney sent a copy of the complaint to Richard Cowen, a reporter for the *Morning Call* newspaper. Cowen then wrote a story about the lawsuit which appeared in the June 9, 1995 edition. Prior to writing the story, he did not contact any of the [appellants]. It is undisputed that between the date of the filing of the Kucharz complaint and the June 9th article ("Cowen Article"), there was no judicial action taken with respect to the case. The article was based solely on the Kucharz complaint itself.

On June 15, 1995, [appellants] filed this instant lawsuit alleging that the Cowen article was defamatory. Specifically, they allege that it did not accurately report the federal action. Pleadings are now closed and the extensive discovery conducted in this case, depositions, interrogatories, requests for production, and requests for admission, have been completed.

On April 25, 1996, [appellees] filed a motion for summary judgment on the basis that the Cowen article is privileged under the Fair Report Privilege and that there is no genuine issue of material fact. Both parties filed briefs on this motion.

Subsequently, on May 8, 1996, [appellants] filed a cross motion for partial summary judgment contending that the Fair Report Privilege does not apply because no judicial action occurred on the Kucharz complaint prior to the Cowen Article. Both parties have also briefed this motion.

This matter is before the court by way of the May 28, 1996 argument list and is now ready for disposition.

(Trial Court Opinion at 1–2). On July 30, 1996, the trial court granted appellees' motion for summary judgment and denied appellants' cross-motion for partial summary judgment. This timely appeal followed.

On appeal, appellants raise the following issues for our review:

1. SHOULD THE FAIR REPORT PRIVILEGE APPLY AS TO ALLEGATIONS CONTAINED IN A JUST–FILED CIVIL COMPLAINT, AS TO WHICH NO ACTION HAS BEEN TAKEN, AND NO RESPONSIVE PLEADING FILED?

2. DID THE LOWER COURT ERR IN CONCLUDING THERE WAS NO ISSUE OF FACT FOR THE JURY AS TO WHETHER THE JUNE 9, 1995 NEWSPAPER ARTICLE PUBLISHED BY THE ALLENTOWN MORNING CALL WAS A FAIR AND ACCURATE ACCOUNT OF THE ALLEGATIONS CONTAINED IN THE FEDERAL COMPLAINT FILED AGAINST THESE DEFAMATION PLAINTIFFS?

(Appellants' Brief at 4).

At the outset, we note that our scope of review from a grant of summary judgment is plenary. *Lebanon Coach Company v. Carolina Casualty Insurance Company*, 450 Pa.Super. 1, 8, 675 A.2d 279, 282 (1996).

[S]ummary judgment is properly entered where the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits demonstrate that no genuine, triable issue of fact exists and that the moving party is entitled to judgment as a matter of law. The court must examine the record in the light most favorable to the non-moving party and resolve all doubts against the moving party. More-

over, the burden is on the moving party to prove that no genuine issue of material fact exists.... We are not bound by the trial court's conclusions of law, but may draw our own inferences and reach our own conclusions. We will reverse a grant of summary judgment only when the trial court has committed an error of law or abused its discretion.

*Id.* at 8, 675 A.2d at 283 (quoting *Butterfield v. Giuntoli,* 448 Pa.Super. 1, 10–11, 670 A.2d 646, 650 (1995), *allocatur denied,* 546 Pa. 635, 683 A.2d 875 (1996) (citations omitted)). After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Jack Anthony Panella, we affirm on the basis of the trial court opinion as set forth below.

A court may properly grant a summary judgment motion where the pleadings, depositions, answers to interrogatories, admissions and affidavits, and appropriate reports, show either that 1) there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or 2) after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Pa.R.C.P. 1035.2.

We will begin our discussion, for coherency, with [appellants]' cross-motion for partial summary judgment alleging that the fair report privilege does not apply to a press account of an initial pleading upon which no judicial action has been taken.

As is evident from the briefs of the parties, there is a scarcity of case law and consensus on this issue. In *Oweida v. Tribune–Review Pub. Co.,* 410 Pa.Super. 112, 599 A.2d 230 (1991), *appeal denied,* 529 Pa. 670, 605 A.2d 334 (1992), the court addressed the applicability of the fair report privilege to an article written from a civil complaint. However, the court remarked in a footnote that because the issue was not raised by the parties, it would express no opinion on the subject. *Id.* at 120, 599 A.2d at 234. Additionally, in *Medico v. Time, Inc.,* 643 F.2d 134 (3rd Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), which interpreted Pennsylvania law on the privilege, the United States Court of Appeals Stated:

> Considerable controversy surrounds republication of defamations contained in pleadings on which no official action has been taken. Although Comment e to Section 611 of the Restatement (Second) of Torts excludes such pleadings from the scope of the privilege, Professor Eldredge writes that "the weight of authority is contrary to the [Restatement] rule, and is that the report of pleadings filed in court which have not yet come before a judicial officer and upon which no judicial action has been taken comes within the privilege." L. Eldredge, The Law of Defamation, Section 79(b)(1), at 430 (1978).

*Id.* at 140 n. 21.

Further, in *Hanish v. Westinghouse Broadcasting Company,* 487 F.Supp. 397 (1980), the District Court for the Eastern District of Pennsylvania considered, but did not decide, the applicability of the privilege to reports based on pleadings. It reviewed Prosser's Handbook of the Law of Torts (4th ed., 1971), which states in section 118 at page 831 that "it is the prevailing view, with some few courts to the contrary, that a pleading or deposition filed in a case but not yet acted upon may not be reported under the claim of privilege". *Id.* at 401. It also reviewed the Restatement (Second) of Torts which provides in comment e to section 611:

> Necessity of official action in judicial proceedings. A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as complaint or petition before any judicial action has been taken is not within the rule stated in this Section.

*Id.*

However, it also remarked that Professor Eldredge, an advisor to the Restatement (Second) of Torts, has written in his recent book:

> Whether the privilege to report a "judicial proceeding" extends to reporting defamatory statements contained in pleadings or other papers filed in court, which have not yet been taken, is a question upon which the cases are in sharp conflict.
>
> It is perfectly clear, with respect to cases decided since 1972, that the heavy weight of authority is contrary to the earlier rule, and is that the report of pleadings filed in court which have not yet come before the judicial officer and upon which no judicial action has been taken comes within the privilege to report "judicial proceedings". The trend is strongly in this direction. Eldredge, The Law of Defamation, section 79(b)(1) at 427, 430 (1978).

*Id.*

The *Hanish* court then went on to state that it was not impressed with the so-called majority rule as stated in Prosser and the Restatement. *Id.* at 402. Instead, although it did not make an ultimate determination, it clearly favored what it termed the "enlightened reasoning" of Judge Pound in *Campbell v. New York Evening Post,* 245 N.Y. 320, 157 N.E. 153, 155 (1927) where he stated that:

> the incongruous result follows that a newspaper may freely . . . publish the contents of a complaint, if it has been read and filed on an ex parte application for an injunction, an order of arrest, an attachment, or an order of publication, yet, if the complaint has merely been filed as a public document in a public office, the newspaper which publishes its contents runs the risk of repeating a libel.
>
> To say that the newspapers may freely publish the entire proceedings in a case from an ex parte application for an order of arrest or other remedial process under the protection of privilege, but may speak only at their own risk before the case actually comes before a court or judge in some form, is to, make a distinction to which publishers give little heed.

*Id.* at 401–402.

The case of *Mengel v. Reading Eagle,* 241 Pa. 367, 88 A. 660 (1913) is the closest that we have been able to find that gives guidance on the issue. In that case, Mengel was in real estate, loan and insurance business. Kornacki gave Mengel money to invest. After a period of time, Kornacki became unhappy with how the money was being managed. Therefore, Kornacki commenced an action in trespass, alleging deceit. Before the complaint was filed, however, a reporter from the defendant obtained a copy of the complaint from Kornacki's attorney. The defendant then published an article describing the allegations set forth in the complaint which was filed eleven days later. Judgment was entered in favor of the defendant and plaintiff appealed.

In affirming the judgment, the court stated:

> While there is nothing in the body of the publication which would have justified the court in pronouncing it libelous as a matter of law, it must be viewed as a whole, including its headlines, in which deceit is said to be charged in the action brought by Kornacki against the appellants and the trust company. If such a charge was made in that action, it was a matter of public record, and as such the appellee was privileged to publish it. Though no declaration had been filed in the action against the appellants at the time the appellee published the account of it, it appeared by competent testimony that the praecipe directed the prothonotary to issue a 'Summons in an action of trespass for deceit'; and the praecipe was part of the record. The jury were properly instructed that among publications which a newspaper is justified in making, and for which its proprietors cannot be held for damages, even if they be libelous, is that of proceedings in courts of justice as taken from public records. (citations omitted).

*Id.* at 373, 88 A. at 662.

Lastly, in *Doe v. Kohn, Nast & Graf, P.C.*, 866 F.Supp. 190 (E.D.Pa.1994), the district court held that, under Pennsylvania law, the fair comment privilege does apply to reports of pleadings even in the absence of judicial actions upon the pleadings. *Id.* at 194, *citing Pittock v. O'Niell*, 63 Pa. 253 (1869); *Mengel v. Reading Eagle Co., supra; Godwin v. Daily Local News*, 36 Chester Co.Rep. 35, N.5 [47 Pa. D. & C.3d 639] (1987); *see also Kimball v. Post Pub. Co.*, 199 Mass. 248, 85 N.E. 103 (1908) (Pound, J.).

Based upon this case law and theory, we cannot reach a conclusion other than that the fair report privilege does apply to reports of initial pleadings upon which no judicial action has been taken. Pleadings are public records, maintained in government buildings, open for review by the general populace. We find no sense to the argument that newspapers, or other media groups, cannot report on pleadings prior to judicial action without opening themselves to a libel action. It is the media's job and business to keep the public informed of pending litigation and related matters conducted in taxpayer funded courthouses.

We will now address the [appellees]' motion for summary judgment. The motion for summary judgment has an important function in the context of a defamation case. *Mosley v. Observer Pub. Co.*, 427 Pa.Super. 471, 475–476, 629 A.2d 965, 967 (1993). This was recognized in *Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), where the Court said:

> Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement.

> In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate. One of the purposes of the *[New York] Times [Co.] v.*

*Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), principle, in addition to protecting persons from being cast in damages in libel suits filed by public officials, is to prevent persons from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government ... Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide open, for self-censorship affecting the whole public life is "hardly less virulent for being privately administered."

*Id.* at 968 (citations omitted).

Although Pennsylvania law affords absolute immunity for defamatory statements contained in pleadings, if relevant to the proceedings in which they are made, *Greenberg v. Aetna Insurance Co.*, 427 Pa. 511, 235 A.2d 576 (1967), *cert. denied*, 392 U.S. 907, 88 S.Ct. 2063, 20 L.Ed.2d 1366 (1968), statements about them made outside the judicial proceedings are subject to a qualified privilege only; the burden is on the injured party to show an abuse of the privilege. *Oweida, supra.*

The Pennsylvania Supreme Court has recognized that "if the ... account is fair, accurate and complete, and not published solely for the purpose of causing harm to the person defamed, it is privileged and no responsibility attaches, even though information contained therein is false or inaccurate." *Mosley, supra*, at 476, 629 A.2d at 967; *Oweida, supra* at 118, 599 A.2d at 233–234. Further, it is not essential that the governmental proceedings or official report be set forth verbatim by the newspaper. *Mosley, supra.* A summary of substantial accuracy is all that is required. *Id.*

*In Oweida, supra*, the Superior Court had occasion to reexamine the historical underpinnings of the so-called privilege of fair reporting and said:

The fair report privilege developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to the risked by the original defamer. Pennsylvania had adopted the republication rule by the turn of the century, and no case brought to our attention suggests that Pennsylvania has abandoned it.

. . .

To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings the law abandons the assumption that the reporter adopts the defamatory remarks as his own.

*Id.*, at 118–119, 599 A.2d at 234, quoting *Medico, supra*, at 137–138 (footnotes omitted).

There is no doubt that the fair report privilege extends to information contained in search warrants and affidavits for search warrants used in public investigations. *See, Mosley, supra* (reporting of information contained in affidavit for a search warrant). It also applies to court documents. *See Oweida, supra* (reporting of serious medical malpractice charges as were set forth in a civil complaint).

There is also no doubt, however, that the fair report privilege is qualified and can be forfeited if the report is inaccurate or unfair. *Mosley, supra*, at 479, 629 A.2d at 969; *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1085 (3rd Cir.1988). The standard for determining whether the fair report privilege has been forfeited has been clearly defined:

The question of whether the fair report privilege has been abused has been distilled by the federal court to a "gist" or "sting" test. "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which

the precise truth would have produced." *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D.Pa.1983). The question is whether a reasonable person, comparing the complaint and the article as a whole, could conclude that the article was a fair and accurate rendition of the complaint. If the reader could conclude that the article carries with it a materially greater "sting", then the fair report privilege has been abused and is thus forfeited. *Mosley, supra.*

The burden is upon the defendant in the first instance to establish the existence of a privileged occasion. *Oweida, supra*, at 121, 599 A.2d at 235. It is then a matter for the trial court to determine whether "the occasion upon which the defendant published the defamatory matter gives rise to a privilege." *Id.* Whether a communication is conditionally privileged is a question for the court. *Id.*

In this case, we find that [appellees have] argued and established that the Cowen article was based on the federal complaint. In fact, [appellants] agree as is seen in paragraph 11 of their complaint wherein they state that "The entire basis for the Cowen article was a civil complaint filed in federal court by Kucharz...." Thus, there exists a presumptively qualified privilege under the fair report rule.

Once the existence of the privilege is established, the burden then shifts to the plaintiff to establish an abuse of that privilege. *Id.* Whether the privilege is abused is a question for the jury. *Id.* However, as with any question of fact, it may be a question that should be answered by the judge rather then by the jury. *Scott v. Extracorporeal, Inc.*, 376 Pa.Super. 90, 103, 545 A.2d 334, 340 (1988). If the evidence is so clear no reasonable person would determine the issue before the court in any way but one, the court will itself determine the issue. *Id.*

It is clear from [appellants]' brief that they are trying to establish an abuse of the privilege by arguing that the article was not a fair and accurate account of the complaint. Specifically, they contend that it was not fair and accurate in one of the

following ways: 1) the choice of certain language used in the headline and in the body of the article: 1) that the article does not clearly indicate which statements are unproven allegations and which are statements of fact; 3) that the article does not accurately report the complaint's allegations of bank conflict-of-interest law; and 4) that the article falsely suggests that the defendants in the Kucharz action were sued for fraud. Lastly, they argue that, even if the article is fair and accurate, it was published for the sole purpose of causing harm to [appellants]. We will address each of these arguments. First, however, in order to fully discuss the weighty issues involved in this case, we must closely examine the Cowen article and the Kucharz complaint.

The June 9, 1995 article announced in its headline, "Dentist says bank tricked him out of land", and the article, in pertinent part, reported as follows:

> A New Jersey dentist and his development company claim they were euchred out of residential subdivision in Northampton County through a cozy arrangement between First Lehigh Bank and some of its officials. Dr. Kenneth M. Kucharz of Bernardsville charges First Valley and its operatives with "conflicts of interest, overreaching and financial manipulations." He contends they violated federal banking law, which Prohibits bank insiders from benefitting personally in securing of loans.

Kucharz . . . alleges:

> * Bank general counsel David Jordan misled him on refinancing of a $1.8 million loan.
>
> * Chairman James Leuthe misused his position as a bank insider "to promote his own outside real estate . . . [and] his engineering company, First Lehigh Engineering Associates."
>
> * Lehigh Engineering dragged its feet on the basic engineering work on Kucharz projects. Without the engineering, Kucharz could not sell lots that would give him income to pay on his loan.

The result was the bank foreclosed on Kucharz's Hickory Hills Estates in Lower Saucon Township, the dentist contends.

. . .

Kucharz's suit gives this Scenario:

In May, 1991, he entered into a "mortgage situation" with the bank for $1.8 million which included the refinancing of certain prior delinquent loans.

. . .

He had no attorney present. He was encouraged to "negotiate" the terms of the transaction in a solitary meeting with Jordan.

Jordan didn't tell him the mortgage papers included provision for confession of judgment. That provision was "buried inside the actual text of the document."

Kucharz was "forced into delinquency" by the defendants. He executed the $1.8 million mortgage under duress because he faced foreclosure on the earlier loans.

The earlier loans had ended up in default because bank officials manipulated the so-called "First Lehigh Bank Prime Rate."

It was a rate purported to be for all customers similarly situated, Kucharz says. It was actually a rate specially tailored for him.

Leuthe failed to disclose he exercised control over bank's lending policies.

Leuthe also didn't reveal he had a controlling interest in DJ Properties, a real estate partnership with Donald Ronca. DJ Properties sold land to Kucharz on prior occasions. Further, Leuthe was part owner of Lehigh Engineering Associates hired by Kucharz to do site development work for his various subdivisions. Kucharz chose Lehigh Engineering because Ronca recommended it.

The defendants willfully concealed from him Leuthe's role in Lehigh Engineering.

Because of Leuthe's outside business interests, the bank officials made a "substandard loan" to Kucharz without

taking into account safe and prudent banking practices. As a result of collusion among Ziegenfuss, Leuthe, Ronca and Lehigh Engineering, the defendants intentionally caused delays in the development of Kucharz's real estate projects.

Without engineering, the lots weren't marketable to the general public. That created a situation where Kucharz fell into default.

The bank filed a confession of judgment against him for nearly $1.4 million in October 1993. This subsequently led to a scheduled sheriff's sale of Hickory Hills in February 1994.

Kucharz claims the bank intended to buy the real estate at the sale and subsequently transfer it to the real estate partnership owned by bank chairman Leuthe and partner Ronca.

But the county court blocked it

The bank did get the property in a tax upset sale in September 1994.

. . .

The Kucharz complaint contained, inter alia, the following:

. . .

15. At all times relevant hereto, the Defendant, First Lehigh Bank, was subject to the bank conflict of interest provisions set forth in federal law at 18 U.S.C. section 215.

. . .

20. ... the plaintiffs believe ... that they were forced into delinquency by the operation of the Defendants as described hereinbelow; said delinquencies have lead [sic] to foreclosure on the last of the Plaintiffs' real estate projects, viz., the project known as Hickory Hills Estates

. . .

. . .

22. Plaintiffs believe ... that they had incurred delinquencies on their earlier loan transactions with the Defendant First Lehigh Bank due to the conflicts of interest, overreaching, and financial manipulations referred to herein.

. . .

24. Plaintiffs believe ... that said earlier loan transactions had ended up in default due in part to the Defendants' manipulation of the so-called "First Lehigh Bank Prime Rate". Plaintiffs further believe ... that the actions of the Defendants in promoting their self-interest over the interests of Plaintiff, ... may have been in violation of 18 U.S.C. Section 215.

25. Plaintiffs believe ... that with respect to their earlier loans with the Defendants the so-called "First Lehigh Bank Prime Rate" was a rate which was not applied uniformly to all of the Bank's customers.

26. Plaintiffs believe ... that although the "First Lehigh Bank Prime Rate" imposed on their earlier loan transactions was purported to be a bank rate imposed upon all similarly situated customers, it was instead nothing more than a specially tailored rate which had been structured solely for the Plaintiffs' loan transactions.

27. Plaintiffs believe ... that the "First Lehigh Bank Prime Rate" imposed upon their earlier loans was misrepresented to them to be a loan rate which was uniformly applied to other customers, when in fact it was not.

28. Based upon the foregoing, Plaintiffs believe ... that in large part the delinquencies paid off by the May 8, 1991, refinancing were in fact delinquencies created by the Bank's manipulation of the so-called "First Lehigh Bank Prime Rate".

29. Plaintiffs also believe ... that the Defendants' chairman and chief executive officer, James Leuthe, failed to disclose to Plaintiffs that, not only did he exercise control over the lending policies of the Defendants, but also, that he exercised a controlling interest in DJ Properties, a real estate partnership he owned with an individual by the name of Donald Ronca. DJ Properties had sold property to the Plaintiffs on prior occasions. Moreover, James Leuthe as a part owner of Lehigh Engineering Associates, Inc., and Lehigh Engineering As-

sociates was hired by the Plaintiffs to do site development work for the various subdivisions developed by the Plaintiffs. Plaintiffs had been referred to Lehigh Engineering Associates by Donald Ronca, the business partner of James Leuthe.

30. Plaintiffs believe ... that the Defendants willfully concealed from Kucharz the fact that Defendants' chairman and chief executive officer, James L. Leuthe, was a business partner of Donald J. Ronca. Plaintiffs further believe ... that the relationship between Donald J. Ronca and James L. Leuthe may have been in violation of 18 U.S.C. Section 215,

31. Plaintiffs believe ... that the Defendants willfully concealed from Kucharz the fact that James L. Leuthe had a personal financial interest in Lehigh Engineering Associates, Inc. Plaintiffs further believe ... that his willful concealment by the Defendants as well as the income earned by James L. Leuthe from work done for Plaintiffs by Lehigh Engineering may have been a violation of 18 U.S.C. Section 215.

32. Plaintiffs believe ... that the Defendants, because of the actions of James L. Leuthe as cited hereinabove, willfully made commercial loans to Kucharz without exhibiting any regard for reasonable, safe and prudent banking practices applicable within the banking industry.

. . .

35. Plaintiffs believe ... that the Defendants, as a result of the interactions and collusion between Defendant Larry R. Ziegenfuss, James L. Leuthe, Donald J. Ronca and Lehigh Engineering Associates, Inc., intentionally caused delays in the development of Kucharz' real estate project, thereby intentionally causing a default on Kucharz' loan obligations.

. . .

37. Plaintiffs believe ... that the Defendants, through the intercession of Defendants' chairman James Leuthe, may have manipulated the Plaintiffs' interest rate while at the same time delaying the engineering on the Plaintiffs' subdivision plans, thereby creating a situation wherein the Plaintiffs would fall into default by their inability to render marketable and salable subdivided lots to the general public.

38. Plaintiffs signed the aforementioned mortgage documents ... while under duress, because the Defendants had already driven the Plaintiffs into default by their actions.

39. Plaintiffs were misled by the Defendants' legal counsel, Attorney David Jordan, who did not inform them that the promissory note contained a provision authorizing the entry of the judgment by confession ...

. . .

42. Plaintiffs believe ... that had they been encouraged to obtain independent legal counsel prior to the refinancing ..., they would have been made aware of the nature of the financial misrepresentations and manipulations which had been perpetrated upon them ...

. . .

44. Thereafter, ..., Defendants filed a praecipe for writ of execution on Plaintiffs' real estate ..., thereby creating a judicial lien on all of Plaintiffs' real estate ...

. . .

51. Plaintiffs believe ... that the Defendants, by filing a complaint confessing judgment against Plaintiffs and by filing a praecipe for writ of execution to levy upon Plaintiffs' real property, were attempting to force Plaintiffs into default and thereby prevent them from selling their lots to pay off their debt to the Defendants.

52. Plaintiffs believe ... that the Defendants intended to purchase the Plaintiffs' real estate at the Sheriff's Sale ..., so as to acquire the Plaintiffs' property and subsequently to transfer that property to a real estate partnership owned by Defendants' chairman, James L. Leuthe and his business partner, Donald Ronca.

. . .

69. Plaintiffs believe ... that they were deceived in may respects, not only with regard to the concealment of the ownership interests of James Leuthe in Lehigh Engineering Associates, Inc., but also, by concealment of the partnership interests of James Leuthe in the real estate partnership known as DJ Properties.

Remembering the standard to be applied in determining whether a report is accurate and fair, we conclude that the article contains no greater "sting" than the actual complaint that was relied upon to write it. As we stated earlier, it is not essential that the entire report/pleading/affidavit be set forth verbatim. *See Mosley, supra,* at 476, 629 A.2d at 967. A comparison of this complaint with the news story discloses that the newspaper accurately reported the averments of the complaint. It reported, as recited in the complaint, that Kucharz was suing the bank and that he alleged that its employees acted wrongfully which resulted in the loss of his land. Even a cursory review and comparison of the complaint and article show that not only were the statements a fair summary of the allegations that were pled, but that the article was almost entirely a verbatim recitation of these allegations. Whether the averments in the complaint were correct or incorrect, the newspaper was privileged to report the information contained therein. *Mosley, supra,* at 481, 629 A.2d at 970.

For the sake of completeness, we find that we must address each of [appellants]' four arguments stated above as well as their contention that the article was published solely to cause harm.

[Appellants]' exceptions to certain words and phrases such as "tricked" in the headline, and "euchred" and "cozy arrangement" in the article are without merit. It is uncontroverted that an article does not lose its privilege "by reason of the alleged 'flippant' and 'smart alecky' style of writing which was used by Time to create reader interest." *Sellers v. Time, Inc.,* 299 F.Supp. 582, 585 (E.D.Pa.1969), *affirmed,*

423 F.2d 887 (3d Cir.1970), *cert. denied,* 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970); *See also, Mitchell v. Pittsburgh Press,* 7 Med. L.Rptr. 2152, 2158 (C.P. Allegheny County, 1981)("an action for defamation cannot be premised solely on the Press writer's style or utilization of vivid words in reporting"; "even such a respected periodical as U.S. Law Week sometimes adds 'color' to enliven an otherwise routine and dull account of a legal decision.")

[Appellants]' next contention is that the article does not clearly indicate which statements therein are unproven allegations of the complaint and which are reported by the defendants as statements of fact. While it is true that a newspaper can forfeit its conditional privilege by failing to clearly state that the allegations of the complaint were simply unproven allegations and not established facts, *Oweida, supra,* at 130, 599 A.2d at 239, this is simply not such a case. The article is replete with words such as "claim", "charges", "contends", and "alleges". With the use of this language, no reasonable jury could conclude that [the appellees] forfeited their privilege.

[Appellants]' next argument is that the newspaper failed to state, as did the complaint, that the bank "may" have violated federal banking laws. Instead, the article uses the word "contends." Once again, we refer to the standard of law that the fair report privilege does not require a verbatim recitation of the document being reported but merely a summary of substantial accuracy. *Mosley, supra.* This argument is also without merit.

[Appellants]' last argument revolves around the fact that the actual cause of action in the Kucharz complaint is a federal civil rights action for violation of due process. However, they contend that the failure to include this piece of information in the article renders it unfair and inaccurate. We disagree. As we have already amply stated, the sole requirement is that the same "gist" be given in the article. Clearly, because [the appellees] practically copied portions of the complaint in the article, there is no different gist. We have not found nor have we been given any case

law which requires that the specific cause of action be identified.

[Appellants]' last argument is that, even if the fair report privilege applies and the article is a fair and accurate characterization of the complaint, there is still a factual issue as to whether the article was published solely for the purpose of causing harm to [appellants]. In support of this argument, [appellants] alleges [sic] that the newspaper was previously critical of the bank and Mr. Leuthe in a week long series of articles published in April, 1993, that Mr. Cowen did not contact anyone from the bank for comment on the lawsuit, that another reporter at the newspaper testified that he would have contacted [appellants] prior to writing the article, and that this same reporter, when shown the complaint, was not interested in writing about the lawsuit.

As we will explain, we are unpersuaded by [appellants]' arguments that the article was published solely to cause harm. First, it is irrelevant that Cowen did not contact [appellants] for comment on the pending lawsuit. In *Oweida, supra*, the Superior Court reversed the trial court for instructing the jury that "the defendants abused the qualified privilege if you believe that the Defendants' failure to attempt to contact the Plaintiff, . . ., prior to publication of the article, was unreasonable." *Id.* at 135, 599 A.2d at 242. It held that an erroneous instruction upon so vital an issue may have affected the verdict and that a new trial was required. *Id. See also, Binder v. Triangle Publications*, 442 Pa. 319, 327, 275 A.2d 53, 58 (1971), *Medico, supra*, at 146–147 ("how a reporter gathers his information concerning a judicial proceeding is immaterial"). Thus, since it is not required in the first place, whether one reporter would have contacted [an appellant] has no import.

We also find without merit [appellants]' contention that intent to cause harm is shown by the fact that another reporter would not have reported on this article and that there had been some critical articles published three years earlier. At the risk of being repetitive, the article merely repeats several allegations made in the complaint with some spiced up language to attract readers' attention. No reasonable jury could conclude that the sole purpose of the article was to cause harm to [appellants].

In light of the above, we hold that the [appellee] newspaper was privileged to report fairly and accurately the information which was contained in the federal court complaint. That the privilege was not abused and that it was not published solely to cause harm is so clear that reasonable minds cannot differ. Therefore, summary judgment is proper.

For the foregoing reasons, we affirm the July 30, 1996 order granting summary judgment in favor of the appellees based upon the outstanding trial court opinion as adopted herein.

Order affirmed.