Gail WEBER, Appellant,

v.

LANCASTER NEWSPAPERS, INC., Sunday News, Intelligencer Journal, Lancaster New Era, Gilbert Smart, Ledger Newspapers, the Sun Ledger, Lynn Ney, Dawn L. Smeltz, Roberta L. Troy, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 16, 2004.
Filed May 24, 2005.
Reargument Denied Aug. 5, 2005.

Ralph D. Samuel, Philadelphia, for appellant.

John C. Connell, Haddonfield, NJ, for Ledger and Sun Ledger, appellees.

George C. Werner, Lancaster, for Lancaster Newspapers, Sunday News, Intelligencer, Lancaster New Era and Gilbert Smart, appellees.

BEFORE: DEL SOLE, P.J., LALLY–GREEN, and POPOVICH, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellant, Gail Weber, appeals from the summary judgment order entered on May 19, 2004. We affirm in part and reverse in part.

**Factual Background**

¶ 2 In December 1997, Dawn Smeltz filed a protection from abuse (PFA) petition against her domestic partner, Patricia Kelley. At the time of the petition, Kelley was the acting chief of police for Quarryville Borough. The bulk of the five-page PFA petition concerned Officer Kelley's abuse of Smeltz. The PFA petition also contained the following allegation: "**Patti's friend, Gail Weber, phoned me at work, harassing me.**" PFA Petition at 3 (emphasis added). This was the only allegation against Weber. Weber was not named as a defendant in the PFA petition. At the time of the petition, Weber was an associate for the firm which performed legal services for the Borough.

**The newspaper articles**

¶ 3 In late 1997 and early 1998, Defendants *Solanco Sun Ledger*, *Sunday News*, and *Lancaster New Era* published eight articles relating to this PFA petition. We will briefly set forth the relevant text of each article.

**Article 1**

¶ 4 On December 21, 1997, the *Sunday News* published a front-page article by Gil Smart. The article (and headlines) read, in pertinent part, as follows:

**Attorney named in abuse petition**

Woman who got protection from abuse order against Quarryville's officer in charge says member of solicitor's firm made harassing call.

An attorney for Quarryville Borough has been accused in a court document of making harassing phone calls to a Mountville woman.

Last week, in the same document, the woman also accused a borough police officer of harassment.

The Mountville woman, Dawn Louise Smeltz, was granted a protection from abuse order, or PFA, by Lancaster County Judge Wayne G. Hummer Jr., who ordered that Quarryville officer-in-charge Cpl. Patricia Kelley refrain from "abusing, stalking, threatening or harassing" Smeltz.

Smeltz had accused Kelley of making harassing phone calls, showing up at her job and threatening to "slit her throat

from ear to ear." Smeltz also threatened to commit suicide.

Smeltz said she and Kelley were in a relationship for nearly 13 years, but in October, Kelley "began acting strangely."

But Kelley isn't the only one Smeltz said harassed her. In November, according to her petition for a PFA, she claims that "Patti's friend, Gail Weber, phoned me at work, harassing me." Weber is an attorney with the firm of Shirk, Wagenseller & Mecum, the borough's solicitors.

Weber, who lives in the Quarryville area, did not return several phone calls for comment last week.

. . .

Smeltz, contacted by phone last week, would not elaborate on what Weber said to her on the phone, saying that "she's an attorney, and I don't want to get into trouble."

. . .

Quarryville officials declined to comment on whether Smeltz's accusation against Weber would affect the borough's relationship with the law firm.

## Article 2

¶ 5 The second article was written by Lynn Ney of the *Solanco Sun Ledger*. This front-page article, published in the December 24–30, 1997 issue, reads in pertinent part as follows:

**Woman charges Kelley with verbal abuse, threats**

Borough lawyer also accused

Acting Police Chief Patricia Kelley has taken vacation after a protection-from-abuse (PFA) order was filed against her.

[After six paragraphs detailing the PFA against Kelley, the article reads:]

Smeltz also accused Gail Weber, an attorney who Kelley is now living with,

of making harassing phone calls to her at work and at church. Weber works for the law firm of Shirk, Wagenseller, Reist and Mecum, the borough's solicitors.

## Article 3

¶ 6 The third article was written by Gil Smart and published in the December 28, 1997 edition of the *Sunday News*. This article indicated that Quarryville Borough hired an independent counsel, David Keller, to investigate Smeltz's accusations against Kelley. The article provides:

¶ 7 "Keller was hired at the urging of borough solicitor Roger Reist of the firm Shirk, Reist, Wagenseller, & Mecum. Another attorney with Reist's firm, Gail Weber, also was accused by Smeltz in her PFA petition of making threatening phone calls."

¶ 8 The article states that Mayor G. Keith Mitchell asked independent counsel Keller to make a recommendation to the Borough council about what to do. According to the article, "that recommendation may involve Kelley's future with the Quarryville Police Department and whether her relationship with Weber constitutes a conflict of interest."

## Article 4

¶ 9 The fourth article, published in December 31, 1997—January 6, 1998 edition of the *Solanco Sun Ledger*, included the following passage:

Kelley's conduct has been questioned recently after a protection-from-abuse (PFA) order was filed against her on Dec. 9 by Dawn Smeltz of Mountville, who said she had a 13–year relationship with Kelley. She charged that Kelley was harassing her, threatened to kill her and also threatened to commit suicide.

She also charged that borough attorney Gail Weber, who Kelley is now living with, was harassing her.

Weber works for the law firm of Shirk, Wagenseller, Relist [sic] and Mecum, the borough's solicitors.

The borough has hired David Keller of the Lancaster law firm Barley, Snyder, Senft & Cohen to look into the situation and make a recommendation to the council about Kelley's future.

The firm will also look into a possible conflict of interest.

## Article 5

¶ 10 The fifth article, written by Lynn Ney for the January 15–21, 1998 edition of the *Solanco Sun Ledger*, included the following passage:

The borough has also hired David Keller, a lawyer, to look into the situation with Kelley and make a recommendation to the council about her future with the department and if her present relationship with Gail Weber, an attorney for the borough, is a conflict of interest.

Kelley was served the PFA at Weber's home in the Quarryville area and has been named in the PFA petition as having harassed Smeltz by phone calls.

. . .

Despite Weber's association with the borough, the council decided to maintain the services of Shirk, Reist, Wagenseller and Mecum, as their solicitor's [sic] for 1998.

## Article 6

¶ 11 The sixth article, written by Gil Smart for the January 25, 1998 edition of the *Sunday News*, included the following passage:

In her petition for the PFA, Smeltz said that after her 12–year relationship

with Kelley ended, Kelley harassed her, threatened to kill Smeltz and also threatened to commit suicide.

[Independent counsel] Keller was hired at the urging of borough solicitor Roger Reist of the firm Shirk, Reist, Wagenseller & Mecum. Another attorney with Reist's firm, Gail Weber, also was accused by Smeltz in her PFA petition of making threatening phone calls.

## Article 7

¶ 12 The seventh article was written by Lynn Ney for the January 26–Feb. 4, 1998 edition of the *Solanco Sun Ledger*. It reported that the Quarryville council had decided to allow Kelley to remain on the police force. The article included the following passage:

A Protection–From–Abuse (PFA) order was filed against Kelley in December by her former roommate of 12 years, Dawn Smeltz of Mountville, who charged that Kelley had threatened to kill her.

Smeltz charges that Kelley said that "if she couldn't have me, no one will." She also said Kelley was verbally abusive and controlling and had threatened to slit her (Kelley's) throat.

Smeltz also accused Gail Weber, an attorney who works for the borough solicitor, Shirk, Wagenseller, Reist & Mecum, and a friend of Kelley's, of making harassing phone calls to her work and at church.

## Article 8

¶ 13 The final article, written by Tom Murse for the January 27, 1998 edition of the *Lancaster New Era*, reported that Kelley would stay on the Quarryville police force. The article also stated that according to independent counsel Keller's report, there was "no 'conflict of interest, or technically inappropriate behavior' by a bor-

ough attorney who had been accused of threatening the woman." A passage near the end of the article states that "Another attorney with Reist's firm, Gail Weber, also was accused by Smeltz in her PFA petition of making threatening phone calls."

## Procedural history of the defamation action

¶ 14 Weber filed a defamation action against Lancaster Newspapers, Inc. ("LNI", publisher of the *New Era* and the *Sunday News* ), the *New Era,* the *Sunday News,* and Gilbert Smart (collectively, the "LNI Defendants"). In the same action, Weber filed a defamation claim against Ledger Newspapers, the *Solanco Sun Ledger,* and Lynn Ney (collectively, the "Ledger Defendants"). Weber alleged that the articles directly led to the loss of her job, injured her ability to gain work in the legal profession, and seriously damaged her reputation.

¶ 15 During the course of this litigation, Weber filed a motion to disqualify the firm of Barley, Snyder, Senft & Cohen. The Barley firm represents the LNI Defendants. Weber alleged that the Barley firm had a conflict of interest because it represented both Quarryville Borough and the LNI Defendants.[1] On January 28, 2002, the trial court denied this motion without a hearing and without issuing an opinion.

¶ 16 Weber also filed a motion asking the trial court to issue a *subpoena duces tecum* to depose the investigative counsel, David Keller, and to compel production of Keller's investigative file. The trial court denied this motion on February 2, 2004 without a hearing or an opinion.

¶ 17 On January 30, 2004, the defendants filed a motion for summary judgment on the defamation claims. The trial court granted this motion on May 19, 2004. The trial court held that summary judgment was appropriate because the "fair report privilege" applied to the newspaper articles. The court explained that the articles represented a substantially fair and accurate account of the PFA petition. Specifically, the court reasoned that the articles may have used the word "threatening" rather than the word "harassing," but this choice of words did not produce a materially greater "sting" than a verbatim account would have created. Trial Court Opinion, 5/19/2004, at 5. This appeal followed.[2]

¶ 18 On January 11, 2005, this Court remanded for a more thorough opinion addressing all of the issues in the case. The trial .court's opinion, dated February 22, 2005, was filed with this Court on March 11, 2005. The trial court reaffirmed its position that the fair report privilege applied to most of Weber's claims. As to other claims, the court held that summary judgment was appropriate because the news reports were substantially true, and/or because the statements were not defamatory. Weber chose not to file a supplemental brief in response to this opinion. We will now address the merits.

¶ 19 Weber raises four issues on appeal:

1. Does the qualified fair report privilege apply to all the statements that plaintiff/Appellant claims are privileged?

2. Was there sufficient evidence of record to require that the question of

---

1. We will explain Weber's argument further *infra,* during our discussion on the merits.

2. The certified record does not indicate that the trial court ordered a Concise Statement of

Matters Complained of on Appeal under Pa. R.A.P. 1925. While we recognize that a Concise Statement is attached to Appellant's brief, it does not appear in the certified record.

abuse of the fair report privilege go to a jury?

3. Was there sufficient evidence of a potential conflict of interest imperiling plaintiff's/Appellant's access to relevant information to warrant disqualification of counsel for one set of defendants?

4. Was it abuse of discretion to deny a motion for limited discovery filed after the close of discovery on evidence critical to a late-announced, new defense, and where defendants demonstrate no prejudice resulting from such discovery?

Weber's Brief at 4.

¶ 20 First, Weber argues that the trial court erred by granting summary judgment, because the fair report privilege did not apply to all of the allegedly defamatory statements. We will begin by discussing the principles of summary judgment, then the law of defamation, then the specific rules surrounding the fair report privilege.

¶ 21 This Court recently summarized the principles of summary judgment, and our standard of review, as follows:

Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

As already noted, on appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Gutteridge v. A.P. Green Servs.*, 804 A.2d 643, 651 (Pa.Super.2002) (citations omitted), *appeal denied*, 574 Pa. 748, 829 A.2d 1158 (2003).

■ ¶ 22 In a defamation case, the **plaintiff** must prove: "(1) The defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." *Porter v. Joy Realty, Inc.*, 2005 PA Super 129, ¶ 6 n. 6, *quoting*, 42 Pa.C.S.A. § 8343(a). Where the issue is properly raised, the **defendant** has the burden of proving: "(1) the truth of the defamatory communication; (2) the privileged character of the occasion on which it was published; [and/or] (3) the character of the sub-

ject matter of defamatory comment as of public concern." 42 Pa.C.S.A. § 8343(b).

¶ 23 Pennsylvania courts recognize the "fair report privilege." *DeMary v. Latrobe Printing & Publ'g Co.,* 762 A.2d 758 (Pa.Super.2000), *appeal denied,* 567 Pa. 725, 786 A.2d 988 (2001).[3] Under this privilege, media defendants have qualified immunity from defamation liability when they report on official governmental proceedings. *Id.* The fair report privilege extends to court pleadings, such as a complaint. *First Lehigh Bank v. Cowen,* 700 A.2d 498, 502 (Pa.Super.1997). The *DeMary* Court succinctly described the scope of the privilege, and its limitations, as follows:

> In Pennsylvania, the fair report privilege protects the press from liability for the publication of defamatory material if the published material reports on an official action or proceeding. *See Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586, 588 (Pa.1963); *Mosley v. Observer Pub. Co.,* 427 Pa.Super. 471, 629 A.2d 965, 967 (Pa.Super.1993). No responsibility attaches so long as the account of the official action or proceeding is fair, accurate and complete, and is not published "solely for the purpose of causing harm to the person defamed." *Sciandra,* 187 A.2d at 589. *See also* RESTATEMENT (FIRST) OF TORTS § 611. "However, this qualified immunity is forfeited if the publisher steps out of the scope of the privilege or abuses the 'occasion.' This can be done by exaggerated additions, or embellishments to the account." *Id.*

at 600, 187 A.2d 586. *See also Mosley,* 629 A.2d at 969.

*Id.* at 763.

¶ 24 The defendant abuses the fair report privilege if the article carries a materially greater "sting" than a precisely accurate retelling of the public proceeding itself. *First Lehigh Bank,* 700 A.2d at 503. Generally, the question of whether the privilege has been abused is a question of fact for the jury. *Id.* The trial court may make that determination as a matter of law, where the evidence is so clear that it points to only one reasonable conclusion. *Id.*

¶ 25 One way a newspaper may abuse the privilege is by placing a misleading and sensationalized "spin" on a relatively insignificant aspect of the public document. For example, in *Tucker v. Phila. Daily News,* 757 A.2d 938 (Pa.Super.2000), C. Delores Tucker, a prominent anti-"gangsta rap" activist, and her husband filed a complaint against the estate of rapper Tupac Shakur. They alleged that they suffered damages because Ms. Tucker was the subject of lewd lyrics on one of Shakur's albums. The complaint also contained a brief paragraph alleging loss of consortium.

¶ 26 This complaint created media attention. Two newspapers prominently paraphrased the complaint as alleging that the lyrics "diminished her sex life." *Id.* at 941. The articles also prominently quoted an attorney for the Shakur estate as questioning "how these lyrics could destroy her sex life." *Id.*

---

**3.** Recently, our Supreme Court **declined** to recognize the "**neutral** report privilege." *Norton v. Glenn,* 860 A.2d 48 (Pa.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1700, 161 L.Ed.2d 539, 2005 U.S. LEXIS 2911. This privilege would immunize media defendants from liability when they accurately report newsworthy-but-defamatory statements made by others, regardless of the reporter's own private views about the truth or falsity of those statements. As our Supreme Court recognized, the neutral report privilege and the fair report privilege are conceptually distinct. The instant case involves the fair report privilege, which is recognized by Pennsylvania courts.

¶ 27 Tucker then filed a defamation claim against the newspapers. Tucker claimed that the sensationalized and sexualized "spin" of the articles defamed her. The newspapers claimed protection under the fair report privilege. The trial court granted relief to the newspapers, but this Court reversed. We reasoned as follows:

> The complaint in question contained many allegations, and yet the published headlines screamed to the public that Ms. Tucker was suing the rap singer because her sex life had been adversely affected. As stated above, a consortium claim encompasses more than just the quality of the sexual lives of a married couple. The articles, at the least, created a false impression regarding the complaint filed. We cannot say, as a matter of law, that the articles contained a "fair, accurate and complete" account of the complaint.

*Id.* at 947. We came to that conclusion even though it is literally true that a loss of consortium claim does indeed encompass a claim of harm to one's sexual relations. *Id.* at 943.[4]

¶ 28 With this background in mind, we will begin our analysis. For each claim of libel, we will examine whether the "fair report privilege" applies as a matter of law. If it does apply, then the court did not err by granting summary judgment. If the fair report privilege does not apply, we will determine whether the trial court's decision to grant summary judgment was correct on any other basis. *Brickman Group, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 928 (Pa.Super.2004) ("We are not bound by the trial court's rationale, and may affirm its ruling on any basis.").

## 1. Weber named as a defendant in the PFA

■ ¶ 29 First, Weber argues that the newspaper articles falsely implied that she was named as a **defendant** in Smeltz's PFA petition. For example, Article 1 carries a large front-page headline: **"Attorney named in abuse petition."** The lead paragraphs read as follows: "An attorney for Quarryville Borough **has been accused in a court document** of making harassing phone calls to a Mountville woman. Last week, in the same document, the woman **also accused** a borough police officer of harassment." (emphasis added).

¶ 30 While it is literally true that Weber was "named" and "accused" in the petition, the fact remains that she was mentioned only incidentally in a petition that overwhelmingly concerns Officer Kelley. The article's headline and lead paragraphs, however, do convey the misleading impression that Weber was named as a defendant in Smeltz's petition. Specifically, the article does not draw any material differences between the treatment of Officer Kelley, who was named as a defendant, and Weber, who was not. For example, after detailing the PFA's accusations against Officer Kelley, the article states:

> **But Kelley isn't the only one Smeltz said harassed her.** In November, according to her petition for a PFA, she

---

4. On appeal, our Supreme Court affirmed our decision in part and reversed in part. *Tucker v. Phila. Daily News*, 577 Pa. 598, 848 A.2d 113 (2004). Our Supreme Court held that the Tuckers were required to prove actual malice. *Id.* at 136. They could do so only if they could establish "that, before Appellant-newspapers printed the articles, the Tuckers or their representative unequivocally told Appellant-newspapers that their loss of consortium claim did not include a claim that the lyrics damages their sex lives." *Id.* Our Supreme Court remanded to allow the Tuckers the opportunity to amend their complaint. *Id.* The fair report privilege was not at issue in the Supreme Court's opinion, because the newspapers chose not to raise this issue. *Id.* at 123 n. 6.

claims that "Patti's friend, Gail Weber, phoned me at work, harassing me." Article 1, ¶ 6.

¶ 31 Indeed, reading the Article 1 as a whole, it is difficult (if not impossible) to discern the truth that only Officer Kelley was named as a defendant. Instead, the article appears to treat Officer Kelley and Weber as interchangeable co-defendants in the PFA petition. In short, a reasonable jury could come to the conclusion that the article conveys the false impression that Weber was named as a defendant.

¶ 32 Furthermore, a reasonable jury could conclude that being named as a defendant in a PFA petition does carry a materially greater "sting" than being mentioned only incidentally. This is not a case where the evidence is so clear that only one conclusion is possible. Thus, this is a claim which should be reserved to the jury. *First Lehigh Bank; Tucker.*

¶ 33 We come to the same conclusion regarding the other newspaper articles. Article 2 carries a large headline stating, "Woman charges Kelley with verbal abuse, threats." The kicker headline states, "Borough lawyer **also accused**." (emphasis added). After recounting the PFA's accusations against Officer Kelley, Article 2 reads: Smeltz **also accused** Gail Weber, an attorney who Kelley is now living with, of making "harassing phone calls to her at work and at church." (emphasis added). Article 3 states in relevant part, "Another attorney with Reists's firm, Gail Weber, was **also accused** by Smeltz in her PFA petition of making threatening phone calls." (emphasis added). After recounting

Smeltz's accusations against Officer Kelley, Article 4 states, "[Smeltz] **also charged** that borough attorney Gail Weber, who Kelley is now living with, was harassing her." (emphasis added). Article 5 states, "Kelley was served the PFA at Weber's home in the Quarryville area and **has been named in the PFA petition** as having harassed Smeltz by phone calls." (emphasis added). Article 6 states, "Another attorney with Reist's firm, Gail Weber, **also was accused by Smeltz in her PFA petition** of making threatening phone calls." (emphasis added). Article 7 states, "**Smeltz also accused Gail Weber,** an attorney who works for the borough solicitor, Shirk, Wagenseller, Reist & Mecum, and a friend of Kelley's, of making harassing phone calls to her work and at church." (emphasis added). Finally, Article 8 states, "Another attorney with Reist's firm, Gail Weber, **was also accused by Smeltz in her PFA petition** of making threatening phone calls." (emphasis added).

■ ¶ 34 These highlighted portions, and the articles as a whole, all convey the distinct impression that Weber was named in the PFA petition as a defendant, along with Officer Kelley. The articles do contain literal truth, but the "spin" on that truth is misleading. The articles imply that Weber was named as a defendant. They never disabuse readers of that false impression. Thus, we conclude that the trial court erred as a matter of law when it held that the fair report privilege applies to this claim.[5]

---

5. In our view, a jury could reasonably conclude that a newspaper defames a person by falsely portraying that person as the defendant in a PFA petition. First, such a communication has a defamatory character, because it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associat-

ing or dealing with him." *Tucker,* 848 A.2d at 123. There is no reasonable dispute that the newspapers published the reports, that they applied to Weber, that readers would understand the defamatory meaning, and that readers would know that the reports applied to Weber. *See,* 42 Pa.C.S.A. § 8343(a). Next, Weber is prepared to prove special harm re-

¶ 35 Before we proceed to Weber's remaining defamation claims, we must address the newspapers' alternative argument that Weber is a public figure, and is thus required to prove "actual malice".

¶ 36 The First Amendment provides heightened protection for libel defendants when the plaintiff is a public official or public figure. *Tucker*, 848 A.2d at 128–130, *citing, inter alia, New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Specifically, the burden is shifted to the plaintiff to show that the statement was false. *Id.* The plaintiff must also show that the defendant either knew that the statement was false, or made the statement with reckless disregard of its falsity. *Id.* This protection is known as the "actual malice" standard. *Id.; see also, Weaver v. Lancaster Newspapers*, 2005 PA Super 165, 875 A.2d 1093 (providing a recent and thorough examination of the interplay between summary judgment standards and the actual malice standard). Importantly, the requirement to show actual malice does **not** apply "to private individuals who speak out about a matter of public concern." *Tucker*, 848 A.2d at 130 n. 22, *citing, Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *see also, Norton*, 860 A.2d at 55.[6]

¶ 37 Thus, it is important to determine whether Weber is a public figure or a private figure. In *Iafrate v. Hadesty*, 423 Pa.Super. 619, 621 A.2d 1005 (1993), this Court summarized the relevant law at length, as follows:

[I]n *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789[,] the Court identified two classes of public figures:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

*Id.* [at 351, 94 S.Ct. 2997].

A person may become a limited purpose public figure if he "thrust[s] himself into the vortex of the discussion of pressing public concerns." *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Such a person uses "purposeful activity" to thrust "his personality" into a "public controversy." *Curtis Publishing Co. v. Butts*, 388 U.S. at 155[, 87 S.Ct. 1975][.] He becomes a limited purpose public figure because he invites and merits "attention and comment." *Gertz[,]* 418 U.S. at 346[, 94 S.Ct. 2997][.] A person may become a limited purpose public figure if he attempts to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants. "A private individual," however, "is not automatically transformed into a

---

sulting to her from the publication. *Id.* Finally, as noted above, the jury could conclude that the newspapers abused a conditionally privileged occasion (*i.e.*, the fair report privilege).

6. If the private-figure plaintiff seeks **punitive** damages, however, he or she must demonstrate actual malice. *Am. Future Sys. v. Better Bus. Bureau*, 2005 PA Super 103, ¶ 21, 872 A.2d 1202, *citing, Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 774, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston v. Reader's Digest Assoc.*, 443 U.S. 157, 167, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

It is the function of the court to ascertain in the first instance whether the plaintiff is a public or private figure. *Smith v. A Pocono Country Place Property Owners Assoc., Inc.*, 686 F.Supp. 1053, 1056 (M.D.Pa.1987). "The classification of a plaintiff as a public or private figure is a question of law to be determined initially by the trial court and then carefully scrutinized by an appellate court." *Id., quoting Marcone v. Penthouse Int'l Magazine, supra*[, 754 F.2d] at 1081 n. 4 [3d Cir.1985].

We agree with the trial court that Frank Iafrate was not a public figure for all purposes. After careful study, we conclude also that he was not a public figure for any limited purpose relevant to this action.

Mere newsworthiness alone does not create a public controversy. *Marcone v. Penthouse Int'l Magazine for Men, supra*, 754 F.2d at 1083.

A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. To determine whether a controversy indeed existed ... the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and

uncovering facts and theories to help the public formulate some judgment .... If the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy. (citations omitted)

*Waldbaum v. Fairchild Publications, Inc., supra* 627 F.2d [1287] at 1296–1297 [C.A.D.C.1980].

Appellant did not inject himself into an issue of public interest, concern or controversy. He did no more than make plans for a private party. The fact that these plans may have formed the basis for a neighbor's ire or that the neighbor elected to call the newspaper and complain did not render appellant a public figure. As the court observed in *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 591 (1st Cir.1980), "*Gertz's* requirement that in order for [private] individuals ... to merit public figure status, they must 'have thrust themselves to the forefront of particular public controversies' [seems] to imply a pre-existing controversy." Moreover, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

*Id.* at 1007–1008 (citations omitted).

¶ 38 Initially, we note that the trial court did not determine whether Weber was a public figure, because the trial court granted summary judgment on other bases. We need not remand for a trial court opinion, however, because the question is one of law. *Iafrate.*

¶ 39 The record reflects that Weber was clearly not a "public figure for all purposes and in all contexts." *Iafrate.* Weber was an associate attorney in a private-practice law firm. Nothing in the record suggests

that she was such a famous or notorious figure in the area as to make her general-purpose public figure.

¶ 40 Moreover, the record does not reflect that Weber became a limited-purpose public figure by injecting herself into a public controversy. Rather, the record reflects that Weber telephoned Smeltz regarding a private matter. Only later did **Smeltz** turn these private issues into a matter of public concern by filing a PFA petition against the local chief of police. Of course, Weber had no control over the fact that Smeltz mentioned her in the PFA petition. Likewise, she had no control over the fact that this petition generated significant media concern. Finally, nothing in the record suggests that Weber took any action to inject herself further into the controversy after it flared up. If anything, the newspaper defendants turned Weber into a public figure by their newspaper reports. *Iafrate.* We conclude that Weber is not a public figure for purposes of this lawsuit. *Id.* As such, she is not required to show actual malice. *Gertz.*

¶ 41 We now turn to Weber's remaining defamation claims.

## 2. Number of phone calls

■■■ ¶ 42 Next, Weber argues that the articles falsely report that Weber telephoned Smeltz more than once. Many of the articles do report that Weber made more than one call. *See,* Articles 2, 3, 5, 6. The text of the PFA petition states, "Patti's friend, Gail Weber, phoned me at work, harassing me."

¶ 43 The trial court found that the articles fairly and accurately summarized the PFA petition in this respect. We agree. The word "phoned" does not indicate how many calls were made. The word "harassed", however, does imply more than one call. *See, e.g.,* 18 Pa.C.S.A. § 2709(a)(3) (defining the crime of harass-

ment, in relevant part, as "engag[ing] in a course of conduct or repeatedly commit[ting] acts which serve no legitimate purpose.") Thus, it was reasonable for the LNI Defendants and the Ledger Defendants to conclude that Smeltz did accuse Weber of making more than one call. In short, the articles fairly summarized the literal words of the PFA. The trial court did not err in granting summary judgment on this claim.

## 3. Use of the word "threatening" vs. "harassing"

■■■ ¶ 44 Weber argues that certain articles falsely report that Weber "threatened" Smeltz. Three articles paraphrased the PFA as stating that Weber "threatened" Smeltz. *See,* Articles 3, 6, 8. In fact, the text of the PFA petition states, "Patti's friend, Gail Weber, phoned me at work, **harassing** me." (emphasis added).

¶ 45 The trial court held that the word "threatening" does not carry a materially greater 'sting' than the word "harassing." While this is a close question, we agree. Both "threatening" and "harassing" carry approximately the same degree of "sting." The trial court did not err in granting summary judgment on this point.

## 4. Phone calls at church vs. at home

¶ 46 Weber argues that certain articles falsely paraphrased the PFA as stating that Weber telephoned Smeltz at church. Articles 2 and 7 do state that Weber telephoned Smeltz at church. The text of the PFA petition states, "Patti's friend, Gail Weber, phoned me at **work**, harassing me." (emphasis added).

■■■ ¶ 47 The trial court held that the substitution of the word "church" for "work" does not carry a materially greater "sting." Trial Court Opinion, 2/22/2005, at 6. While this is again a close question, we

agree. A telephone call at church does arguably carry a greater 'sting' than a telephone call at work, but the difference is not so material as to take the claim out of the fair report privilege. The trial court did not err in granting summary judgment on this claim.

### 5. Smeltz provided information to the press

¶ 48 Next, Weber argues that the articles falsely stated that Smeltz provided information to the press. Weber's Brief at 17. This allegation has nothing to do with the contents of the PFA, or paraphrasing the PFA. The fair report privilege only applies "if the published material reports on an official action or proceeding." *De-Mary.* Thus, the fair report privilege does not apply to this allegation.

¶ 49 On the other hand, the court did not err in granting summary judgment on this point because Weber has failed to develop any argument that this alleged falsehood was defamatory. Our Supreme Court recently summarized this fundamental aspect of libel as follows:

> "In an action for defamation, the plaintiff has the burden of proving ... the defamatory character of the communication." 42 Pa.C.S. § 8343(a). "It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Thomas Merton Center v. Rockwell International Corp.,* 497 Pa. 460, 442 A.2d 213, 215–16 (Pa.1981).
>
> To determine whether a statement is capable of a defamatory meaning, we consider whether the statement "tends so to harm the reputation of another as to lower him in the estimation of the

community or to deter third parties from associating or dealing with him." *Birl v. Philadelphia Elec. Co.,* 402 Pa. 297, 167 A.2d 472, 475 (Pa.1960) (quoting RESTATEMENT (FIRST) OF TORTS, § 559 (1989)). "Libel is the malicious publication of printed or written matter which tends to blacken a person's reputation and expose him to public hatred, contempt or ridicule." *Schnabel v. Meredith,* 378 Pa. 609, 107 A.2d 860, 862 (Pa.1954); *see also Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899, 904 (Pa.1971) (same). "The court must view the statements in context." *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987).

> Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

*Thomas Merton,* 442 A.2d at 216 (internal citations and quotations omitted). "It is not enough that the victim of the [statements] ... be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." *Scott–Taylor, Inc. v. Stokes,* 425 Pa. 426, 229 A.2d 733, 734 (Pa.1967).

*Tucker,* 848 A.2d at 123–124.

¶ 50 In the instant case, Article 1 did state that Smeltz spoke to the press about her claims. Weber now argues that Smeltz never spoke to the press about her claims. Weber's Brief at 17. In any event, this claim simply does not rise to

the level of defamation because it does not impugn Weber's reputation.

### 6. Kelley was living with Weber at the time of the PFA

¶ 51 Next, Weber argues that the articles falsely claimed that Weber was living with Officer Kelley at the time of the PFA.[7] Articles 2 and 4 do carry this implication. Moreover, this fact was not stated or implied in the PFA to any degree. Thus, the fair report privilege does not apply. *DeMary.* On the other hand, Appellant has failed to develop any legal argument that this statement was defamatory. Thus, the trial court did not err in granting summary judgment on this point.

### 7. Quarryville retained an independent counsel to investigate whether Weber's continued employment at the Borough solicitor's law firm constituted a conflict of interest.

¶ 52 Finally, Weber argues that the articles falsely stated or implied that Weber was being investigated for a conflict of interest.[8] The trial court addressed this claim as follows:

As this Court understands the language of the articles, none imply that, "Quarryville retained an independent counsel to investigate whether Weber's continued employment at the borough solicitor's law firm constituted a conflict of interest." Superior Court [unpublished memorandum] at 14. Rather, they all clearly state the focus of the investigation was Kelley's continued position with the borough in light of the allegations, possibly because of her relationship with [Weber] but mainly because of the impropriety of having a police chief accused of a domestic dispute violation. The plain meaning of the language in the articles does not infer [sic] that [Weber] was unfit to do her job because of the events or that her law firm was somehow in jeopardy because of the press the incident received.

Trial Court Opinion, 2/22/2005, at 7–8.

¶ 53 We agree with the trial court. The articles do not imply that Weber herself was involved in a conflict of interest, or that she was being investigated for a conflict of interest. Article 1 states that "Quarryville officials declined to comment on whether Smeltz's accusation against Weber would affect the borough's relationship with the law firm." This report simply states that the newspaper asked officials for comment on a matter, but the officials refused to comment. Article 3 states that an independent counsel was hired to investigate Officer Kelley, not Weber. Similarly, Article 4 states that independent counsel Keller was hired to "look into the situation and make a recommendation about [Officer] **Kelley's** future." (emphasis added). The article reports that "the firm will also look into a possible conflict of interest." On the other hand, this allegation is so vague that it does not clearly apply to Weber herself. Likewise, Article 5 states that the borough hired independent counsel Keller to determine whether Officer Kelley's relationship with Weber constitutes a conflict of interest. This statement was clearly directed at Officer Kelley, not at Weber. Indeed, Article 5 goes on to state that "Despite Weber's association with the Borough, the reporters received information about the investigation from government officials. *See,* Trial Court Opinion, 2/22/2005, at 8. We will assume *arguendo* that the fair report privilege does **not** apply.

---

7. Weber acknowledges that she is now living with Kelley, but she asserts that she was not living with Kelley at the time of the PFA.

8. The trial court found that the fair report privilege applied to this issue insofar as the

council decided to maintain the services of Shirk, Reist, Wagenseller and Mecum, as their solicitor's [sic] for 1998." Article 8 states that Keller concluded that there was "no 'conflict of interest, or technically inappropriate behavior' by a borough attorney who had been accused of threatening the woman." While this article does imply that Weber was investigated for a conflict of interest, the main thrust of this report is that no such conflict of interest existed. Thus, we conclude that this passage cannot be deemed defamatory. The trial court properly granted summary judgment on the conflict-of-interest allegations.

¶ 54 For the reasons set forth above, we affirm the trial court's grant of summary judgment with respect to all defamation issues, with one exception. Specifically, we conclude that the court erred by granting summary judgment on the issue of whether Weber was falsely identified as a defendant in the PFA petition.

¶ 55 We now turn to Weber's remaining claims. Weber argues that the trial court erred by denying her motion to disqualify the law firm of Barley, Snyder, Senft and Cohen, counsel for the LNI Defendants.

¶ 56 A simplified explanation of Weber's claim is as follows. Attorney Keller is an attorney with the Barley firm. Keller represented Quarryville Borough as "special counsel" when he advised the Borough about the PFA matter. Insofar as Weber was an associate for the law firm whose partner, Roger Reist, was the solicitor for Quarryville Borough. Because Reist held an official position with the Borough, Weber argues that she, as an associate, also held an official position with the Borough. Thus, Weber argues, Keller had an attorney-client relationship with Weber. Keller's law partner, George Werner, also of the Barley firm, represents the LNI Defendants. Thus, the Barley firm has conflicting duties of loyalty because it

has an attorney-client relationship with both Weber and her opponents, the LNI Defendants. Weber argued that this conflict of interest interfered with her ability to determine the truth of the allegation that Keller (in his role as special counsel) had actually investigated a potential conflict of interest involving Weber.

¶ 57 When reviewing a trial court's order on disqualification of counsel, we employ a plenary standard of review. *Vertical Res., Inc. v. Bramlett*, 837 A.2d 1193, 1201–1202 (Pa.Super.2003). Courts may disqualify attorneys for violating ethical rules. *Id.* On the other hand, courts should not lightly interfere with the right to counsel of one's choice. *Id.* Thus, disqualification is appropriate "only when both another remedy for the violation is not available and it is essential to ensure that the party seeking disqualification receives the fair trial that due process requires." *Id.* (citation omitted); *see also,* Pa. R. Prof. Conduct 1.7, Official Comment ("Where the conflict is such as to clearly call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection must be viewed with caution, however, for it can be misused as a technique of harassment.")

¶ 58 The trial court addressed this claim as follows:

[Weber] at no time was a client of [the Barley firm]; her law firm at no time was a client of [the Barley firm], and Patricia Kelley at no time was a client of [the Barley firm]. However, [Weber] contends that because the Borough hired David Keller of [the Barley firm] to look into the issue between Patricia Kelley and the Borough, it constitutes a conflict in the present case between her and defendant Lancaster Newspapers.

This Court ruled promptly on this issue and denied recusal. . . .

[Weber] has no right to raise a conflict of interest claim based upon the simple factual basis of this case. She was never a client of [the Barley firm], neither was her firm. Keller was not hired to investigate her, he was hired to investigate conflicts between Kelley's legal situation and the Borough to prevent any further scandals in the chief of police position. [The Barley firm] and Keller's only ·"ties" to [Weber] is that they were the law firm hired by the Borough to investigate any conflict with [Weber's] friend due to the protection from abuse petition filed against [Weber's] friend.

[Weber] claims she has a right to know the information gathered by Keller during his investigation of the situation between the Borough and Kelley. She has no right to this information. The Borough was the client and it is their right to raise the attorney-client privilege. [Weber] has no ability to invade that privilege just because her name might have come up in some context during an investigation of the situation between Kelley and the Borough. Kelley's continued employment with the Borough was the possible liability situation for them, not [Weber's] continued appearances on behalf of her law firm. [Weber] cannot put herself in the shoes of Kelley for purposes of asserting a conflict. Therefore, because [Weber] has no standing to even assert a conflict of interest claim, this Court did not find it necessary to recuse [the Barley firm] from representing Defendant Newspapers in this case.

Trial Court Opinion, 2/22/05, at 3–4.

¶ 59 We agree in part with the trial court's analysis. First, we agree with the trial court that Weber herself was not a client of the Barley firm. We note, however, that a party seeking to disqualify an attorney need not have an attorney-client relationship with that attorney. *American Dredging Co. v. Philadelphia,* 480 Pa. 177, 389 A.2d 568, 572–573 (1978). Thus, the lack of an attorney-client relationship between Weber and the Barley firm is not dispositive. *Id.;* Pa. R. Prof. Conduct 1.7 (Official Comment). To the extent that Weber alleges a conflict based on the notion that the Barley firm represents both LNI and the **Borough**, this fact is of limited relevance because the Borough is not a party to this case.

¶ 60 Most importantly, we have already held that the trial court did not err in granting summary judgment with respect to the reporting of Keller's "conflict of interest" investigation. Thus, on remand, Keller's investigation will not be a significant issue. Given this fact, disqualification of the Barley firm will not be necessary to ensure a fair trial for Weber or any other party. Thus, we hold that the trial court did not err by denying Weber's disqualification motion.

¶ 61 Finally, Weber argues that the trial court erred by denying her motion for permission to subpoena independent counsel Keller and his investigative file. The background to this claim is as follows. In December of 2003, Weber allegedly learned for the first time that the LNI Defendants were preparing to present evidence that Weber had indeed engaged in a conflict of interest. Weber then filed a motion to subpoena Keller and his file. The trial court denied this motion on February 2, 2004, without issuing an opinion.[9]

---

9. We note with disapproval that despite our express directions to do so, the court did not explain its reasoning in its supplemental opinion.

¶ 62 For the reasons set forth above with respect to disqualification, we conclude that the trial court did not err by denying the motion for a subpoena. Again, we have already held that the court did not err by granting summary judgment on the conflict of interest issue. As a result, Keller's investigation will not be a significant issue on remand. As such, it will be unnecessary for Weber to glean information on this topic with a subpoena. Appellant's final claim lacks merit.

¶ 63 The trial court's order dated January 28, 2002 (regarding the motion to disqualify counsel) and the order dated February 2, 2004 (regarding the motion for a subpoena) are affirmed. The trial court's order granting summary judgment is affirmed in part and reversed in part. Specifically, we reverse with respect to Weber's claim that she was falsely named as a defendant in the PFA petition. We affirm the grant of summary judgment with respect to all other issues.

¶ 64 Affirmed in part and reversed in part. Jurisdiction relinquished.